# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JABER ALDAHE

    Plaintiff,

v.                                              Case No. 06-CV-11125

MATSON NAVIGATION COMPANY, INC.,

    Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S PROPOSED EXPERTS AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the court is Plaintiff Jaber Aldahe's December 30, 2007 "Motion to Strike Defendants' Proposed Experts' Testimony" and Defendant Matson Navigation Company, Inc.'s December 28, 2007 "Motion for Summary Judgment." The matter has been fully briefed and the court concludes that a hearing is unnecessary. See E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant in part and deny in part Plaintiff's motion and grant in part and deny in part Defendant's motion.

## I. BACKGROUND

Plaintiff, a sailor, filed this action on March 15, 2006, asserting four counts against Defendant for (1) negligence under the Jones Act, 46 U.S.C. § 688 *et seq*, (2) unseaworthiness under federal maritime and admiralty law, (3) maintenance and cure[1]

---

[1]Under federal common law, maintenance refers to the shipowner's responsibility to provide food and lodging to a seaman who suffers an injury or illness while in service of the ship and cure is the shipowner's duty to provide necessary medical care and attention. *Al-Zawkari v. American S.S. Co.*, 871 F.2d 585, 586 n. 1 (6th Cir. 1989).

and (4) unearned wages.² The instant motions focus mainly upon the first two counts of negligence and unseaworthiness.

In 2005, Plaintiff set sail as an assistant cook on Defendant's ship, the S.S. Lurline. (7/11/05 Accident Report, Def.'s Ex. B).³ Around 4:30 a.m. on July 9, 2005, Plaintiff was injured when he inhaled harmful fumes when "using hot water and bleach to clean [deck] stripper from his mop" inside a gear locker, which is a confined space. (7/11/05 Accident Report at 1-2, Def.'s Ex. B.) Lucille Aguilar, the ship's steward and Plaintiff's supervisor, averred that the locker was "small" and "maybe five by four [feet]." (Aguilar Dep. at 15, Def.'s Ex. C.) She claimed Plaintiff told her that he closed the door behind him before cleaning the mop because he did not want to wake any nearby shipmates. (*Id.* at 26.)⁴

Plaintiff requested and received treatment at least three times in the following ten days for respiratory tract irritation and in each case the physician declared that Plaintiff was fit for duty. (7/13/05 Seaman's Request for Medical Treatment, Def.'s Ex. E; 7/20/05 Seaman's Request for Medical Treatment, Def.'s Ex. F; 7/21/05 Seaman's

---

²The court's July 26, 2006 opinion and order granted Plaintiff summary judgment for his unearned wages claim (Count III) and denied summary judgment for his claim for maintenance and cure (Count IV) and exemplary damages.

³Unless otherwise noted, the court's citations to the record will refer to the exhibits accompanying the parties' summary judgment motion briefs (not to be confused with the similarly labeled exhibits to the expert testimony briefs).

⁴The record indicates that this factual averment is disputed, as an initial doctor's report states that the locker was a "small space, however, it was not enclosed." (7/13/05 Terrazas Report, Def.'s Ex. D.) Consistent with the standard of review as it appears below, the court will view the facts in the light most favorable to Plaintiff as the non-moving party.

Request for Medical Treatment, Def.'s Ex. H.) On July 13, 2005, a doctor in Oakland, California diagnosed upper airway inflammation and tracheal bronchitis. (7/13/05 Terrazas Report, Def.'s Ex. D.) The doctor prescribed an Azmacort inhaler with instructions to seek follow-up treatment in one week if symptoms persist. (*Id.*) Plaintiff sought such treatment in port in Honolulu on July 20, 2005 at the Straub Clinic, which recommended that Plaintiff "continue present medications." (Straub Emergency Department Discharge Instructions, Def.'s Ex. G.) Plaintiff again sought treatment on the following day. (7/21/05 Seaman's Request for Medical Treatment, Def.'s Ex. H.) He returned to the Straub Clinic, where Dr. Roy Adaniya determined that Plaintiff's chemical bronchitis "has been inadequately treated with Azmacort." (7/21/05 Adaniya Report, Def.'s Ex. I.) Adaniya prescribed a "prednisone pulse" - a steroid medication - consisting of three 10 mg tablets daily for four days, then two tablets daily for two days, then one table for one day and then no tablets. (*Id.*)

On the evening of July 30, 2005, Plaintiff suffered an anxiety attack. (Captain's Log, Pl.'s Ex. K.) Captain Mike Buzzard consulted via satellite telephone with a doctor, who advised that Plaintiff stop taking Prednisone "as it may be causing the anxiety attack." (*Id.*) Plaintiff underwent a drastic change in personality, becoming paranoid and experiencing visual and auditory hallucinations. (8/2/05 Koyanagi Report, Def.'s Ex. J.) Plaintiff left the ship permanently in Honolulu on August 2, 2005 due to his condition. (*Id.*) He was "admitted to psychiatry for acute psychosis." (*Id.*)

Plaintiff returned to his residence in Dearborn, Michigan and filed this suit, alleging injuries including physical pain, mental anguish, respiratory inflammation, brain damage, continuing psychological problems and the attendant inability to work and

3

otherwise attend to his affairs. (Pl.'s Compl. at ¶¶ 8-9.) In his motion to strike Defendants' experts' testimony, Plaintiff challenges (1) the qualifications of Defendant's internal medicine expert and (2) the methodology of Defendant's psychiatric expert. In the motion for summary judgment, Defendant argues (1) there is no negligence because Defendant fulfilled its duty to Plaintiff and Plaintiff cannot establish proximate cause and (2) there is no evidence to support Plaintiff's claim of unseaworthiness. The court will decide each motion in turn.

## II.  PLAINTIFF'S MOTION TO STRIKE EXPERTS' TESTIMONY

### A.  STANDARD

Federal Rule of Evidence 702 provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court held that, when faced with a proffer of expert scientific testimony, the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 580 (1993). This ruling was later interpreted by the Court to apply to all expert testimony, not only scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The party proffering the expert bears the burden of persuading the trial court that the expert has specialized knowledge that will aid the fact finder in understanding the evidence or determining a fact at issue. *Nelson v. Tennessee Gas Pipeline Co.*, 243

F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). The trial court has wide discretion when determining whether to admit or exclude opinion testimony. *United States v. Paris*, 243 F.3d 286, 288 (6th Cir. 2001).

Expert testimony on ultimate issues for the trier of fact is not *per se* inadmissible, but the court has latitude to restrict testimony that is not helpful to jurors. Fed. R. Evid. 704; *United State v. Sheffey*, 57 F.3d 1419, 1425 (6th Cir. 1995); *Shahid v. City of Detroit*, 889 F.2d 1543, 1547-48 (6th Cir. 1989) (exclusion of expert testimony is not proper if expert's opinion on the ultimate issue amounts to a legal conclusion). Expert opinions should not be admitted if they merely tell the jury what result to reach. *Woods v. Lecureux,* 110 F.3d 1215, 1220 (6th Cir. 1997) ("It is, therefore, apparent that testimony offering nothing more than a legal conclusion--i.e, testimony that does little more than tell the jury what result to reach--is properly excludable under the Rules.").

## B.  Discussion

### 1.  Defendant's Proposed Internal Medicine Expert

Plaintiff contends that Dr. Herbert Malinoff is only qualified as an internal medicine expert and therefore incompetent to render the alleged psychiatric opinions contained in his reports and deposition testimony. Defendant disputes Plaintiff's characterization of Malinoff's opinions and argues that he deferred to the expertise of psychiatrists about Plaintiff's condition and merely stated conclusions that draw upon his training and experience in internal medicine.

Malinoff's reports state that he relied on various written records and did not personally examine Plaintiff. (Malinoff Reports, Pl.'s Mot. to Strike Ex. T.) Malinoff concluded the following:

> 1. There is no medical evidence or documentation to suggest that inhalation or exposure to chlorine or floor stripper can cause an organic reaction to the brain which would produce hallucinations or a psychotic episode.
>
> 2. With regarding [sic] to the treatment with Prednisone, although it can temporarily exacerbate a pre-existing psychotic condition, it will not cause someone to become psychotic.
>
> 3. The only logical explanation for [Plaintiff's] symptoms is a pre-existing condition, whether or not previously diagnosed.

(*Id.* at 6.) Malinoff also opined that Plaintiff likely has an underlying mental health disorder that is "unrelated to his employment about this ship." (*Id.* at 15-16.) Elsewhere, Malinoff presented a "diagnostic impression" of Plaintiff that included "thought disorder." (*Id.* at 28-29.) Malinoff did "not identify any specific relationship between [Plaintiff's] employment and the onset of his thought disorder." (*Id.* at 29.) This conclusion rests upon these assertions:

> 1. The "weeks" between Plaintiff's exposure to the chemicals in the mop and the development of his psychiatric symptoms.
>
> 2. The small dose of Prednisone taken for a short time, which is "not sufficient to precipitate longstanding permanent derangement in mental/thought processes. The mental status changes associated with prednisone use are short lived and are easily reversible once prednisone is discontinued."
>
> 3. Plaintiff "more likely than not has the onset of a schizophrenic type illness, as he is in the correct age group

6

>           for this . . . there is no relationship between his employment
>           and the onset of his organic/psychiatric illness."

(*Id.* at 29-30.)

Having reviewed Malinoff's reports and deposition testimony, the court agrees with Plaintiff that certain assertions go beyond the proper scope of Malinoff's expertise. This case is similar to *Meridia Products Liability Litigation v. Abbott Laboratories*, 447 F.3d 861 (6th Cir. 2006). In *Meridia*, the Sixth Circuit held that the district court did not abuse its discretion when it ruled that a duly qualified pharmacologist could testify about how a drug can elevate the blood pressure of some patients but that the pharmacologist was not permitted to testify on the physiological effects of high blood pressure. *Id.* at 868. Similarly, to the extent that Malinoff's testimony concerns the internal medicine effects of fume inhalation and steroid treatment, including the mental health problems, such testimony falls within the domain of his education and expertise. He goes too far, however, when he opines upon thought disorders and surmises that Plaintiff likely suffered from a schizophrenic type illness. Conclusions like these are psychiatric in nature. They go beyond the realm of internal medicine and therefore fall outside Malinoff's area of expertise. For these reasons, the court will grant in part and deny in part Plaintiff's motion with respect to Malinoff.[5]

---

[5]To the extent that Plaintiff argues in the plural against the methodology of Defendants' "experts," (Pl.'s Mot. to Strike at 7-8), which would include Malinoff, the court does not agree that Malinoff's conclusions are the product of unreliable methodology. His reports and deposition testimony rely upon sufficient data and analysis and therefore pass muster under *Daubert*.

## 2. Defendant's Proposed Psychiatric Expert

Plaintiff's core argument attacks Dr. Calmeze Dudley's opinion regarding whether Plaintiff suffered a steroid-induced psychosis. In particular, Plaintiff argues that Dudley's conclusions are not based on facts in evidence because (1) Plaintiff's refill prescription of Prednisone was not tapered and Dudley's conclusion assumes tapered dosage and (2) Plaintiff has some emotional predisposition and prior psychological treatment and Dudley assumed the absence of this background. (Pl.'s Mot. to Strike at 8-13.) The court disagrees.

A central issue is indeed what role the Prednisone played in Plaintiff's alleged injuries. Plaintiff's arguments attack the weight of Dudley's conclusions, not their basis in science. Dudley conceded that a non-tapered dosage might affect his analysis and admitted that long-term steroid-induced psychosis is medically possible. (Dudley Dep. at 27, 48. Pl.'s Mot. to Strike, Ex. P.) But he stressed that probabilities are important in his business and that it is not statistically likely for a steroid-induced psychosis to persist for years. (*Id.* at 48.) The court is therefore not persuaded that a lack of factual underpinning justifies striking Dudley's testimony.

Further, Dudley's testimony is relevant to other factual issues. Importantly, Dudley met personally with Plaintiff to evaluate him and reached several important psychiatric conclusions about Plaintiff. (Dudley's Reports, Pl.'s Mot. to Strike, Ex. P.) If credited by the finder of fact, Dudley's testimony will weigh heavily in evaluating the extent of Plaintiff's injuries and his general psychiatric state. Under the circumstances, the court will not exclude Dudley's testimony.

## III.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'") (citation omitted).  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'"). The court does not weigh the evidence to determine the truth of the matter, but must decide if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### B. Discussion

#### 1. General Protections for Seamen Under Federal Common Law

Seamen have a "unique package of remedies" under federal common law for injuries or illness suffered while working. *Blainey v. American Steamship Co.,* 990 F.2d 885, 886 (6th Cir. 1993). Several policy reasons underlie the development of this law, including the vulnerability of essentially indentured mariners who do hard work for relatively low wages and risk abandonment in foreign ports, and the national commerce and defense interest in favor of an effective merchant marine system. *Id.* at 887; *see also Stevens v McGinnis, Inc.*, 82 F.3d 1353, 1356-1357 (6th Cir. 1996). Seamen are "emphatically the wards of the admiralty." *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593 (6th Cir. 2001) (citations omitted).

Congress therefore codified a set of extraordinary remedies for seamen in the Jones Act, 46 U.S.C. § 688 *et seq.* In particular, Plaintiff brings claims of negligence

under the Jones Act and an independent common law claim of unseaworthiness. Defendant attacks these claims in its motion and the court will consider each in turn.

### 2. Negligence

According to the Jones Act:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.

46 U.S.C. § 688. Plaintiff is afforded rights parallel to those given to railway employees under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et. seq.* The FELA provides that:

> Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. "Therefore, in suits under the Jones Act, the court must determine whether the evidence justifies the conclusion that the employer was negligent and that the employer's negligence played any part, however slight, in producing the injury to the seaman." *Perkins*, 246 F.3d at 598 (citing *Sweeney v. Am. Steamship Co.,* 491 F.2d 1085, 1089 (6th Cir. 1974)).

11

By this standard, Plaintiff has presented a question of fact concerning Defendant's alleged negligence under the Jones Act.  The bulk of Defendant's argument misses the mark, for Defendant stresses the steps that it took in providing Plaintiff with putatively proper medical care and argues that the physicians gave appropriate care.  This argument begins too late in the timeline, however.  A key component of Plaintiff's theory of negligence is that he never should have inhaled the fumes in the first place.  As such, it is legally sufficient under the Jones Act to simply allege that Defendant's failure to ensure that the mop was rinsed before it was stored gives rise to Plaintiff's claim of negligence.  Viewed in the light most favorable to Plaintiff, the dirty mop and the fume inhalation are inextricable primary events in a chain of causation that, certainly, led to his medical treatment and, perhaps, caused his injuries, including exacerbation of an underlying condition.

Plaintiff finds further support in the conclusions of Roger Wabeke, his industrial hygeine expert.  (Wabeke Report, Pl.'s Ex. M.)  Wabeke asserts that basic workplace chemical safety practices should include (1) immediate triple-rinsing of swabs and mops in fresh water (or dangling mops over the stern into swirling sea water for at least ten minutes, followed by a fresh water rinse), (2) chemical hazard training and (3) slowly adding chemicals (such as bleach) to open containers in a well ventilated area on deck.  (*Id.*)  As such, a reasonable finder of fact could conclude that, whatever Plaintiff's role was, Defendant was at least negligent in part for its failure to insist upon practices that would have prevented Plaintiff's fume inhalation.  For Jones Act claims, there is a

reduced standard for causation between the employer's negligence and the employee's injury. *Perkins*, 246 F.3d at 598 (citation omitted).

The court cannot accept Defendant's argument that its actions "did not play the slightest part in causing Plaintiff's injuries." (Def.'s Br. at 8.) As noted above, there is a question of material fact concerning whether Plaintiff shut the door to the gear locker when he mixed the chemicals. There is also a question of material fact with respect to whether and why the mop Plaintiff used was left soaked in a chemical and not rinsed before it was stored. A factfinder could thus view the mop as a latent risk the Defendant had a duty to prevent and, failing that, discover and correct. Plaintiff's comparative negligence, if any, may mitigate damages, and even preclude liability if the finder of fact concludes that Plaintiff was the sole cause of his injuries. *Perkins*, 246 F.3d at 598 (citation omitted). At this juncture, the court cannot conclude as a matter of law that Plaintiff's alleged comparative negligence should be fatal to his claims.

The court agrees with Plaintiff's argument that the outcome in *Tomlinson Fleet Corp. v. Herbst*, 268 F.2d 642 (6th Cir. 1959), is instructive. In that case, the court upheld a jury verdict of negligence against the shipping company. The plaintiff had fallen down a stairway that the jury found was dark and covered in one spot by a "foreign, slippery substance." *Id.* at 643. The court noted evidence that an oiler was on watch, whose duties included going up and down the same stairway. *Id.* "A reasonable inference could be drawn by the jury that this oiler had spilled oil on the step." *Id.* Similarly, a factfinder in this case could reasonably infer that one of Plaintiff's crewmates left the mop unwashed. This court finds no appreciable difference between

13

Plaintiff's theory of negligence under the Jones Act and the successful theory of the plaintiff in *Tomlinson*.

### 3. Unseaworthiness

Shipowners have "an absolute duty to maintain a seaworthy ship, the breach of which imposes liability without fault, i.e., strict liability. *Perkins*, 246 F.3d at 602 (citation omitted). The duty covers the vessel itself, as well as its "appurtenant appliances and equipment." *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 99 (1944). A seaworthy ship is reasonably fit for its intended use and the shipowner's actual or constructive knowledge of the unseaworthy condition is not necessary for purposes of liability. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960). The condition of unseaworthiness may arise from several circumstances, including inadequate staffing or the existence of a defective condition, however temporary, on a physical part of the ship. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). To prove a claim of unseaworthiness, Plaintiff must show that the unseaworthy condition "was the substantial and direct or proximate cause of [his] injuries." *Perkins*, 246 F.3d at 602.

Plaintiff relies upon four factors of unseaworthiness as articulated by the Ninth Circuit: (1) whether the warranty of a seaworthy vessel applied to the seaman, (2) whether the seaman was injured by the vessel's equipment or appurtenances, (3) whether the vessel's equipment or appurtenances were reasonably safe and fit for its intended use or purpose and (4) whether the unseaworthy condition caused the seaman's injury. *Ribitzki v. Canmar Reading & Bates, Ltd.,* 111 F.3d 658, 664 (9th Cir. 1997). He also cites *Mitchell*, which remanded a claim of unseaworthiness, clarifying

14

that notice of the condition is not a necessary element of the claim. In *Mitchell*, the plaintiff slipped on a rail that was covered for ten to twelve feet with slime and fish gurry. 362 U.S. at 540. The plaintiff followed the recognized custom when he stepped on the rail to reach a ladder attached to the pier. *Id.*

Because the standard of causation is higher for this claim*, see Perkins*, 246 F.3d at 602, the court's analysis must reach a different conclusion. As an initial matter, the record indicates that the mop at issue was not in its essential character somehow defective. Rather, a combination of otherwise innocuous circumstances - stripping agent on the dirty mop, mixed by Plaintiff with bleach in an allegedly confined and poorly ventilated area - was the alleged genesis of Plaintiff's harmful inhalation of fumes. Pursuant to the report of Wabeke, chemicals and dirty mops are an ordinary phenomenon on ships and there are established practices for dealing with them, typically in open areas on deck. The mere presence of a soaked and unwashed mop on board is therefore insufficient as a matter of law for a claim of unseaworthiness. Nothing in the record suggests that prolonged exposure to fresh air would have changed the nature or harmfulness of any of the chemicals involved.

With respect to *Mitchell*, it is apparent that the issue of notice was the primary question before that court, not whether a dirty rail could qualify as a matter of law as an unseaworthy condition. Even if *Mitchell* had answered the latter question in the affirmative, the proximate cause between a dirty rail and a seaman slipping after stepping on it is manifest. In the instant case, the line of causation is much more attenuated, as described above. While questions of fact remain under the "slightest"

cause rule that applies to Jones Act negligence claims, the more exacting standard of causation for unseaworthiness claims is a higher hurdle that Plaintiff's cause of action cannot overcome. The record before the court presents no question of fact concerning the seaworthiness of Defendant's vessel and attendant parts. The court will therefore grant summary judgment to Defendant for this claim.

## V.  CONCLUSION

IT IS ORDERED that Plaintiff's "Motion to Strike Defendants' Proposed Experts' Testimony" [Dkt. # 28] is GRANTED IN PART and DENIED IN PART.  Specifically, the motion is GRANTED with respect to conclusions that go beyond the internal medicine expertise of Herbert Malinoff and DENIED with respect to conclusions that fall within his expertise.  With respect to Calmeze Dudley, the motion is DENIED.

IT IS FURTHER ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 27] is GRANTED IN PART and DENIED IN PART.  Specifically, the motion is GRANTED with respect to Count II (unseaworthiness) and DENIED with respect to Count I (negligence under the Jones Act, 46 U.S.C. § 688).

  S/Robert H. Cleland  
ROBERT H. CLELAND  
UNITED STATES DISTRICT JUDGE

Dated:  March 11, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 11, 2008, by electronic and/or ordinary mail.

  S/Lisa Wagner  
Case Manager and Deputy Clerk  
(313) 234-5522